IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 1, 2002 Session

## CHERYL NICHOLS v. TRANSCOR AMERICA, INC.

**Appeal from the Circuit Court for Davidson County**
**No. 98C-2177     Marietta M. Shipley, Judge**

---

**No. M2001-01889-COA-R9-CV - Filed June 25, 2002**

---

A female prisoner who was allegedly raped by an employee of TransCor America, Inc., an inmate transportation company, brought suit against the company for negligence and breach of contract. The trial court granted partial summary judgment to the defendant company on the negligence claim, ruling among other things that it is not a common carrier under Tennessee law.  The court also denied the company's motion for summary judgment on the plaintiff's contract claim.  Both parties filed applications for an interlocutory appeal, which we granted.  We affirm the trial court as to both issues.

**Tenn. R. App. P. 9 Appeal by Permission; Judgment of the Circuit Court
Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and PATRICIA J. COTTRELL, JJ., joined.

Sidney Gilreath and Elizabeth Murphy, Knoxville, Tennessee; Steve Gibbins, Austin, Texas, for the appellant, Cheryl Nichols.

Robert J. Walker, J. Mark Tipps, and W. Scott Sims, Nashville, Tennessee, for the appellee TransCor America, Inc.

## OPINION

### I. AN ALLEGED RAPE AND A CIVIL SUIT

On October 25, 1997, Cheryl Nichols was being moved from a Florida jail to a Texas prison. Van transportation was provided by TransCor America, Inc., a Tennessee corporation that is a wholly-owned subsidiary of Corrections Corporation of America.  Angel Rivera was one of two TransCor employees who accompanied Ms. Nichols and other inmates during this journey.  Ms. Nichols alleged that while on route, Mr. Rivera raped her in a gas station bathroom in Natchitoches, Louisiana.  Mr. Rivera apparently admitted to sexual contact with Ms. Nichols, but claimed that it

was consensual. TransCor subsequently terminated Mr. Rivera's employment for violation of company policy against any sexual contact between prisoners and employees.

On August 6, 1998, Ms. Nichols filed a complaint against TransCor and Rivera in the Davidson County Circuit Court, asking for $5,000,000 in compensatory damages. Mr. Rivera could not be found, and was not served with process. The plaintiff's claims against TransCor were premised upon negligent hiring, retention, training, and supervision of its employee, as well as breach of contract. She also claimed that TransCor had violated her constitutional rights while acting under color of state law. *See* 42 U.S.C. § 1983. The action was subsequently removed to the U.S. District Court because of the federal claim.

On March 20, 2000, the Federal District Court ruled against Ms. Nichols on her constitutional claim. The court noted that the parties did not dispute that TransCor was acting under color of state law, but it found there to be no evidence of any conduct on the part of the company to support the theory that it had willfully deprived the plaintiff of her constitutionally protected rights. The court also declared that Section 1983 claims can only be asserted against defendants who cause constitutional violations by their own actions, and that a private corporation, like a state agency, cannot be held vicariously liable under Section 1983 for its employee's actions. The court accordingly dismissed Ms. Nichols' federal claim on summary judgment, but it declined to exercise jurisdiction over the plaintiff's state law claims, and remanded the case to state court for adjudication of those claims.

Defendant TransCor subsequently filed a motion in circuit court to dismiss the remaining claims against it for failure to state a claim under Tenn. R. Civ. P. 12.02(6), or in the alternative, for summary judgment. Following arguments on the motion, the trial court granted summary judgment to the defendant on all the plaintiff's claims, except for breach of contract. The basis for the court's Memorandum and Order, dated September 8, 2000, was the lack of evidence that TransCor had negligently hired, trained or retained Mr. Rivera as an employee, or that it had been otherwise negligent with regard to Ms. Nichols' safety during the transport. The court also found that the alleged acts of Mr. Rivera were committed outside the course and scope of his employment, and thus that TransCor could not be held vicariously liable for those acts.

The plaintiff had argued as another basis of liability that as a common carrier, TransCor had a non-delegable duty to adhere to "the highest standard of care for the safety of its passengers." *See Henshaw v. Continental Crescent Lines, Inc.*, 499 S.W.2d 81 (Tenn. Ct. App. 1973); *Jenkins v. General Cab Co. of Nashville*, 135 S.W.2d 448 (Tenn. 1940). The court ruled, however, that TransCor did not meet the definition of a common carrier, because it did not offer its services "to the public generally." *See Brown v. Allright Auto Parks, Inc.*, 456 S.W.2d 660, 665 (Tenn. Ct. App. 1973).

The plaintiff subsequently filed a Motion to Alter or Amend the Summary Judgment, based on newly discovered evidence, and furnished the court with a document whose existence the defendant's representatives had chosen not to reveal during discovery. The first sentence of

TransCor's Interstate Commerce Commission Certificate reads, "This certificate is evidence of the carrier's authority to engage in transportation as a common carrier by motor vehicle." The defendant also filed a motion, asking for summary judgment on the plaintiff's breach of contract claim.

Another hearing followed, and on December 8, 2000, the trial court ruled on the two pending motions. In light of the new evidence presented by Ms. Nichols, the court ruled that the plaintiff had created a genuine issue of material fact as to whether TransCor should be considered a common carrier for purposes of tort liability. The court accordingly reversed its summary judgment on that issue alone.

The court also found there were questions of material fact as to the terms of the implied contract between TransCor and the Florida authorities, and as to whether Ms. Nichols should be considered a third-party beneficiary of that contract. The court accordingly denied the defendant's motion for summary judgment on the question of breach of contract, and ruled that the resolution of that question was a matter to be entrusted to the trier of fact.

The defendant subsequently filed another motion to reconsider, and after a further hearing, the court visited the common carrier question once more, in light of relevant case law, including *Hawkins County v. Mary Davis*, 391 S.W.2d 658 (Tenn. 1965). In that case, our Supreme Court held that by transporting pupils to and from school, Hawkins County did not thereby become a common carrier of passengers, but acted as a private carrier, "charged with the duty to exercise reasonable and ordinary care under the circumstances for the safety of the children in its school system thus being transported."

The court reversed itself again, declaring that despite the existence of the I.C.C. certificate, TransCor was not a common carrier, because like the Hawkins County School District, the defendant did not offer its services to the general public, but only to a specific class of passengers. The court further stated that it would grant any party's request for an interlocutory appeal, without a further motion. Both parties availed themselves of the court's offer, and on August 22, 2001, this court agreed to hear their appeals.

## II. IS TRANSCOR A COMMON CARRIER?

A common carrier of passengers has been defined as "one who undertakes for hire to carry all passengers indifferently who may apply for passage." *Roberts v. Knoxville Transit Lines*, 259 S.W.2d 883 (Tenn. Ct. App. 1952).[1] While common carriers may include operators of many different types of transportation, the distinguishing characteristic of a common carrier is not the mode of transportation employed, but the nature of its relationship to the general public. *See N.C. Railroad v. Messino*, 33 Tenn. (1 Sneed ) 220 (1853) (railroads); *Sanders v. Young and McFerrin,* 38 Tenn. 219 (1858) (ferries); *Marshall v. Nashville Ry. & Light Co.*, 101 S.W. 419 (Tenn. 1907)

---

[1]The category of common carriers includes not only carriers of passengers, but also certain carriers of goods. For the purpose of this discussion, we will only consider the law as it applies to carriers of passengers.

(trolleys); *Union Transfer Co. v. Finch*, 64 S.W.2d 222 (Tenn. Ct. App. 1932) (buses); *Wishone v. Yellow Cab Co.*, 97 S.W.2d 452 (Tenn. Ct. App. 1936) (taxis); *Capital Airlines, Inc. v. Barger* 341 S.W.2d 579 (Tenn. Ct. App. 1960) (airlines).

A common carrier is bound to transport anyone who requests its services. It does not have the right to refuse passengers who offer the proper fare, so long as it possesses the capacity to carry them. *Hogan v. Nashville Interurban R.R.*, 174 S.W. 1118 (1915). Organizations designated as private carriers or contract carriers may also carry passengers, but only pursuant to individual contracts, entered into separately and voluntarily with each customer. *Kieronski v. Wyandotte Terminal R.R.*, 806 F.2d 107, 109 (6th Circuit 1986); *Warmath v. North Am. Acc. Ins. Co.*, 241 S.W.2d 938 (Tenn. Ct. App. 1951).

The significance of the designation of a transportation provider as a common carrier for the purposes of this discussion lies in the heightened duty of care towards its paying passengers that such a designation imposes upon the operator. *White v. Metropolitan Government of Nashville and Davidson County*, 860 S.W.2d 49 (Tenn. Ct. App. 1993). While a common carrier is not an insurer of passenger safety, it is held "to the exercise of the highest degree of care and foresight" in its operations, and may even be held liable for the tortious acts of its employees. *Jenkins v. General Cab Co. of Nashville*, 135 S.W.2d 448 (Tenn. 1940); *McClellan v. Tennessee Electric Power Co.*, 123 S.W.2d 822 (Tenn. 1938).

A private carrier to the contrary is only held to the duty of reasonable and ordinary care. This does not mean indifferent care or merely token efforts. The degree of care deemed to be reasonable may vary, depending on the situation. In *Hawkins County v. Mary Davis*, 391 S.W.2d 658 (Tenn. 1965), for example, the court said that the duty of the school bus driver is to "exercise special care proportionate to the age of the child and its ability, or lack of ability, to care for itself."

In some situations, reasonable care may imply a duty that proves to be as great, or even greater than the duty of a common carrier. For example, it has been held that a common carrier only owes the duty of ordinary care to its passengers before they have boarded and after they have alighted from the carrier's vehicle. *Nashville, Chattanooga & St. Louis Railway v. Newsome*, 206 S.W. 33 (Tenn. 1918); *Southern Railway v. Crutcher,* 1 Tenn. Civ. App. 231 (1910). But the heightened duty of a school bus driver towards underage passengers may continue after the child has alighted, and until he has safely crossed the road. *Cartwright v. Graves*, 184 S.W.2d 373 (Tenn. 1944).

The plaintiff argues that her introduction into the record of certain documents and materials have created a material issue of fact as to whether TransCor is a common carrier, and that the issue should therefore be decided by a jury. The record contains TransCor's Interstate Commerce Commission Certificate, as well as certificates issued by the states of Tennessee and Texas. It appears to us, however, that those certificates were issued for purposes of regulation and/or taxation, and that they do not supercede the analysis under tort law by which common carriers are distinguished from private or contract carriers. Further, the fact that the I.C.C. may have authorized

TransCor to operate as a common carrier does not mean that the company has actually operated as one.

Appellant also directs our attention to promotional materials prepared by TransCor's marketing department, which tout the company's size, its facilities, and its expertise. The record indicates that TransCor operates in all 50 states, and that it transports between 40,000 and 70,000 prisoners each year. One brochure boasts that it transports all types of prisoners, "including male, female, high risk, those with medical conditions, juveniles, and short notices/deadlines" and shows its phone number in bold type with the slogan "One call does it all." In one document submitted to the Missouri Department of Correction, TransCor stated, "The contractor represents himself or herself to be an independent contractor offering such services to the general public."

Notwithstanding this document, there is no evidence in the record that TransCor has actually offered to transport any passengers other than prisoners. Further, there is no evidence sufficient to overcome the proof of TransCor's actual mode of operation, both in general and in the specific incident that gave rise to the present case. TransCor does not provide transportation to the general public, nor is it obligated to carry anyone, except by specific contract. It does contract with a variety of parties, including federal and state agencies, and with both public and private incarceration facilities, but not with individual members of the public. While it boasts about the size of its operations, we do not believe that size is determinative of common carrier status. A company that operates a few taxis in a small city can be a common carrier, while a large charter bus company may not be.

### III. RESTATEMENT OF TORTS § 314A

The *Restatement of Torts (Second)* discusses the duties of common carriers to their passengers in § 314A(1), and names other parties who are subject to a similar duty. These include innkeepers, § 314A(2), and landowners who hold their property open to the public, § 314A(3). Also, "[o]ne who is required by law to take or who voluntarily takes custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." § 314A(4).

The appellant argues that Tennessee has expressly recognized the application of *Restatement* § 314A(4) to prisoners, and cites three unpublished cases of this court, and a United States Supreme Court case, as authority for that proposition. All of those cases do mention § 314(A)(4), but none of them is on point, as they all involve negligence by correctional employees rather than intentional acts. More importantly, however, they do not stand for the proposition that the appellant is advocating, but rather for its opposite.

*Kane v. State*, No. 89-75-II (Tenn. Ct. App. at Nashville, filed Nov. 15, 1989), was a suit brought by the mother of a mentally disturbed young man who committed suicide in his jail cell. The trial court granted summary judgment to the state, on the ground that the suicide was an independent, intervening cause of the decedent's injury, which relieved the state of any liability. We

rejected this proposition, and reversed the trial court's judgment, holding that once the jailer becomes aware that a prisoner in his charge is likely to hurt himself, he assumes a heightened duty to protect that prisoner from the danger of self-inflicted injury. As the appellant points out, we did use the term "heightened duty" several times in this opinion, but we held this heightened duty only arose "when the custodian knew or should have known that the prisoner might harm himself."

In *Gilliam v. Williamson County*, No. 01A01-9407-CV-00341 (Tenn. Ct. App. at Nashville, filed Dec.30, 1994), a prisoner who suffered a broken leg while cutting a tree branch on work detail claimed that the defendant should never have entrusted him with the use of a chain saw. We stated in that opinion, that "[p]ersons having custody of prisoners are not insurers of the prisoners' safety. They are simply required to exercise ordinary and reasonable care for the protection of the life and health of the persons in their custody."

The same language about persons having custody of prisoners not being insurers of the prisoners' safety is found in *Langley v. Metropolitan Government*, No. 87-323-II (Tenn. Ct. App. at Nashville, filed Nov. 18, 1988). Mr. Langley was seriously injured when he leaped out of an open sixth story courtroom window, after being convicted of second-degree murder. He argued that the officers escorting him "knew, or in the exercise of reasonable care, should have known of [his] depression and unstable mind following his conviction . . . ." The defendant argued that it breached no legal duty to Mr. Langley, and that his own actions were the only cause of his injuries. In reversing the trial court's grant of summary judgment to the defendant, we noted that jailers "are not expected to be fortune tellers, psychologists, or psychiatrists," but that "they cannot be deliberately indifferent to a prisoner's physical or psychological needs. Thus, they are required to exercise ordinary and reasonable care for the protection of the life and health of the persons in their custody."

*Daniels v. Williams*, 474 U.S. 327 (1986) was a landmark case in which the Supreme Court held that the deprivation of constitutional rights under the due process clause is not implicated when injuries are suffered by prisoners as a result of simple negligence by correctional employees. Appellant relies solely on a parenthetical statement in the opinion that "[j]ailers may owe a special duty of care to those in their custody under state tort law . . . ." There is no reference to Tennessee in the opinion, and no discussion of the nature or extent of the "special duty" owed.

One thing that the above cases have in common is a rejection of the theory that jailers can absolve themselves of their duty of ordinary and reasonable care towards the prisoners in their custody. They also demonstrate that the extent of that duty varies with the circumstances. But none of them indicates that a jailer can be held to the same standard of care as a common carrier.

In the present case, it appears to us that the requirements of reasonable and ordinary care obligated the defendant to diligently and thoroughly screen, select, and train its agents, and to take reasonable steps to protect the prisoners in the custody of those agents. To survive summary judgment, the plaintiff had to allege facts sufficient to create a genuine issue of material fact as to whether the defendant has failed to use such care in regard to the employment of Mr. Rivera. While

the plaintiff made many allegations in regard to the practices and policies of TransCor, the trial court found that none of them related sufficiently to its various theories of negligence to meet this minimum threshold.

## IV. "THE HUNT-FUGATE TRILOGY"

As an alternate theory of liability, the plaintiff's attorney cites language in three obscure Tennessee cases that he calls "the Hunt-Fugate Trilogy." In each of those cases, *Hunt-Berlin Coal Co. v. Paton*, 139 Tenn. 611, 202 S.W. 935 (1918), *Life & Casualty Insurance Company of Tennessee v. Russell*, 51 S.W.2d 491 (Tenn. 1932), and *Fugate v. Cincinnati, New Orleans and Texas Pacific Railway,* 183 S.W.2d 867 (Tenn. 1944), a party injured by the intentional act of a corporate employee attempted to hold the company liable.

Our Supreme Court stated the general rule that "the master is liable only for the authorized acts of the servant, and the root of his liability for the servants' acts is his consent, express or implied thereto . . ." but observed that there were some exceptions, using almost identical language in all three cases:

> (a) Where the master is under contract, expressed or implied, with the person wronged, or under a law-imposed duty, requiring the master to refrain from mistreatment of him. Into this class fall, for example, assaults upon passengers by railway employees. *Knoxville Traction Co. v. Lane* 103 Tenn. 379, 53 S.W. 557, 46 L.R.A., 549, and cases in accord.

> (b) Where the nature of the employment or the duty imposed on the servant is such that the master must contemplate the use of force by the servant in performance, as a natural or legitimate sequence. Illustrating this class are cases involving assault and homicide by special officers in the master's employ; assaults by guards employed to protect the master's property; trainmen protecting their trains from trespassers; servants sent to repossess or take property. It is generally held in such circumstances that the master will be liable though the wrong be done by means of a deadly weapon in the hand of the servant.

> (c) Where a dangerous instrumentality is intrusted by the master to the servant, which has a capability of harm to the public . . . .

139 Tenn. at 619, 202 S.W. at 937 (citations omitted from sections (b) and (c)). After analyzing the various situations in these three cases, our Supreme Court found that the exceptions did not apply, and declined to hold the company liable.

The plaintiff argues that section (a) is applicable to her situation, because TransCor's contract with the State of Florida provides that "[a]ll inmates transported by the contractor shall be treated in accordance with Department of Correction's rules, regulations, policy and procedure directives,

and relevant Florida statutes to insure the safety and security of inmates . . . ." It also states that "[p]roper security shall be provided inmates when using toilet facilities on or off the transport vehicle."

It appears to us, however, that the duty of ordinary and reasonable care encompasses the duty not to mistreat others, and that this duty can be said to apply to virtually all individuals and institutions in our society. Further, the example of *Knoxville Traction Co. v. Lane,* supra, cited in section (a) of *Hunt,* supra, involves the duties of a common carrier towards its passengers. The plaintiff has cited no case to us that has extended the exception of section (a) to defendants that are not common carriers, nor are we aware of any such case.

## V. IS MS. NICHOLS A THIRD-PARTY CONTRACT BENEFICIARY?

The parties agree that Ms. Nichols was transported pursuant to an oral contract that was formed during phone calls between TransCor's offices in Nashville and the sheriff's office in Seminole County, Florida, and confirmed by fax, but they agree as to little else.[2]

Ms. Nichols contends that the oral contract "piggy-backed" off a more general contract between TransCor and the Florida Department of Corrections, which contained provisions that TransCor would transport prisoners safely. She argues that as an intentional third-party beneficiary of that contract, she was entitled to sue for its breach. TransCor argued that even assuming that the contract incorporated a term concerning the plaintiff's safety, she still could not be considered an intentional beneficiary.

Ms. Nichols relies heavily upon the case of *Owens v. Haas,* 601 F.2d 1242 (2nd Cir. 1979), for the proposition that a prisoner can be deemed to be a third-party beneficiary of a contract between correctional institutions. In that case, Mr. Owens, a federal prisoner who was cooperating with the United States Government, was transferred from a federal prison to a county jail for his own safety. At the jail, he became the unfortunate victim of a severe beating by correctional officers. He sued for civil rights violations and breach of contract. The Second Circuit found that it could not preclude the possibility that he could be considered a third-party beneficiary of the contract between the Federal government and the county, and it remanded the case to the lower court for further proceedings.

The plaintiff has found only one Tennessee case which has cited *Owens v. Haas,* supra, but that case did not involve a third-party beneficiary issue. *See Timberlake by Timberlake v. Benton,*

---

[2]The plaintiff contends that we should not even address the contract issues, since the trial court did not directly deal with those issues in its order of May 4, 2001. She notes that TransCor did not file a timely application for interlocutory appeal of the trial court's order of December 8, 2000, which contained the court's ruling on the contract issues. See Rule 9, Tenn.R.App.P. However, in our order granting interlocutory appeal, we stated that having reviewed the applications of both parties, we concurred with the trial court's conclusion "that an interlocutory appeal on these issues may prevent needless, expensive and protracted litigation." We are still of that opinion, and it appears to us that we are entitled to review the contract issues pursuant to our authority under Rule 2, Tenn.R.App.P.

786 F. Supp. 676, 695 (M.D. Tenn 1992). Other than *Timberlake*, there are apparently no Tennessee cases in State or Federal Court that have mentioned *Owens v. Haas*. We note also that *Owens v. Haas* can be distinguished from the present case, because Mr. Owens' transfer was initiated for his own protection, whereas Ms. Nichols was being transported to Texas so she could be incarcerated for crimes she committed in that state.

The leading case in Tennessee on the requirements for third-party beneficiary status is *Owner-Operators v. Concord EFS*, 59 S.W.3d 63 (Tenn. 2001). In that case, a group of independent truckers claimed that they were third party beneficiaries of contracts between a bank that processed credit card transactions and two truck stop operators. The contracts at issue prohibited the truck stop operators from adding a surcharge to purchases of fuel made with credit cards. The truckers claimed that they were charged more than customers who paid for their fuel with cash. This court ruled that the truckers were indeed third party beneficiaries, and thus were entitled to enforce the contracts (*see Independent Operators v. EFS,* No. M1999-02560-COA-R3-CV (Tenn. Ct. App. at Nashville, filed Feb. 29, 2000)). The Supreme Court reversed us, and set out the following framework for evaluating third-party beneficiary cases:

> A third party is an intended third-party beneficiary of a contract, and thus is entitled to enforce the contract's terms, if
>
>> (1) The parties to the contract have not otherwise agreed;
>> (2) Recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties; and
>> (3) The terms of the contract or the circumstances surrounding performance indicate that either:
>>> (a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or
>>> (b) the promisee intends to give the beneficiary the benefit of the promised performance.

> In so holding, we reiterate that our primary focus is upon the intent of the contracting parties.

Applying the above test, we can clearly distinguish this case from the decision in *Concord*. We note that neither the bank nor the truck stop operators owed an independent duty to customers to charge a particular price for fuel, whereas TransCor is clearly obligated to at least make reasonable efforts to protect prisoners entrusted to them.

Summary judgment is only available when there is no genuine dispute as to material facts, and the moving party is entitled to judgment as a matter of law. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993); *Taylor v. Nashville Banner Publishing Co.*, 573 S.W.2d 476 (Tenn. Ct. App. 1978). If a contract is plain and unambiguous, its meaning is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms. *Petty v. Sloan*, 277 S.W.2d 355

(Tenn. 1955). If a contract is not plain and unambiguous, parole evidence may be used to interpret its meaning. *Carter County v. Street*, 252 S.W.2d 803 (Tenn. Ct. App. 1953). Where the parole evidence is conflicting, or admits of more than one conclusion, the disputed portions of the contract may be submitted to the jury with proper instructions. *Jackson v. Miller,* 776 S.W.2d 115 (Tenn. Ct. App. 1989); *Forde v. Fisk University*, 661 S.W.2d 883 (Tenn. Ct. App.1983).

As we indicated above, the contract between TransCor and Seminole County, Florida was entered into through an exchange of telephone calls and at least one fax between the parties. A fax in the record states that the customer is the Seminole County Sheriff's Department, that Sergeant Mike Almodovar is the assignor, and that the transportation charge is in accordance with the "formulated rate." That rate includes a basic mileage rate and a female surcharge per mile that are identical with the rates included in a contract between TransCor and the Florida Department of Corrections.

A critical fact in dispute is whether the terms of the contract with the Department of Correction are incorporated into the contract with the county. Sergeant Almodovar's affidavit states that based upon his experience, the county's contract was based upon an understanding that its "rates, terms, and conditions" would be identical to "specific rates, terms and conditions contained in the then existing contract between TransCor America, Inc., and the State of Florida Department of Corrections and any amendments thereto."

We note that if Sergeant Almodovar is correct, then a further exploration of Florida law is necessary in order to determine the terms under which Ms. Nichols was transported. Section XII.9. of the contract with the Department of Corrections reads, "All inmates transported by the contractor shall be treated in accordance with the Department of Corrections' rules, regulations, policy and procedure directives, and relevant Florida Statutes to insure the safety and security of inmates, assigned staff and the public, while providing humane treatment to the inmate." We also note that Section XII.13.6 of the state contract reads, "[a]t all times, there must be a minimum of two (2) officers, of which at least one officer must be the same sex as that of the inmate present during the transporting of inmates."[3]

We agree with the trial court that the plaintiff raised a genuine question of material fact as to the terms of the contract under which Ms. Nichols was transported from Florida to Texas. Until those terms are established, the question of whether or not she may be entitled to sue as an intended third-party beneficiary under the contract cannot be answered. We accordingly affirm the trial court's order declining to grant TransCor summary judgment on the plaintiff's contract issue.

_____

[3]As an alternate contract theory, the plaintiff notes that TransCor followed a course of dealing whereby it would forward an exemplar "boilerplate" contract to a prospective client-facility as a starting point for negotiations. That contract provides that in assuming custody of prisoners, TransCor will follow the facility's "written policies and procedures... The record contains an unexecuted "boilerplate" contract, and documents setting out Seminole County's policies and procedures. A section titled "Inmate Rights" states that "[i]nmates should be protected from personnel abuse, corporal punishment, personal injury, disease, property damage and harassment," and "[h]arrasment or abuse of inmates is strictly prohibited."

## V.

We affirm both the order of the trial court granting the defendant summary judgment on the plaintiff's negligence claim, and its order declining to grant the defendant summary judgment on the plaintiff's contract claim. Remand this cause to the Circuit Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant, Cheryl Nichols.

_____

BEN H. CANTRELL, PRESIDING JUDGE, M.S.